May it please the Court, Counsel. My name is Christy Lauri and I represent the Plaintiff Trustees in this matter. The District Court's order granting the defendant's motion for summary judgment and dismissing the Trustee's complaint in its entirety was erroneous. This is true because the Trustees both pled and litigated a breach of contract claim against Defendant Charps, which was not adjudicated by the District Court, also because the evidence is sufficient on the record to establish liability both on the contract and as well as the pled vicarious liability claims against all the defendants. As such, we are requesting that this Court reverse the District Court's award of summary judgment liability to the Plaintiff Trustees in this case as well as overturn the corresponding fees award to the defendants. On a remand, we seek additional records with respect to the time records, the SDX reports, and corresponding communications as well as responses to discovery that were withheld from the defendants despite the fact that those time records are both relevant and responsive to the Trustees' discovery. With respect to the claim against Sharps, on page 7 of the District Court's order, it erroneously concluded that the Trustees' only theory of recovery was joint enterprise, joint venture, and alter ego liability. I point this Court both to, in the appendix, page 2707, paragraph 39, says, Sharps, of the Trustees' complaint states, Sharps Welding and Fabricating, Sharpentier Clearwater Energy Group, C&G Construction, and Alpha Oil and Gas should be enjoined from further refusal and failure to allow the funds authorized agent access to their employment and payroll records. Additionally, on pages 2712 through 2713 in the paragraphs 1 and 4 of our prayer for relief, we seek an order adjudicating that the defendants be required to produce for inspection and audit payroll and employment records as well as for judgment against the defendants for all unpaid contributions discovered due and owing pursuant to that audit. Was there ever discussion, in the record, how much money you anticipate was not paid that should have been paid into the funds? Before the District Court, there was both Exhibit 2 and Exhibit 5 to Mr. Ciro's declaration was the audit invoice. The audit invoice is broken down into three categories. The Sharps reported operators, so individuals that were employed and paid by Sharps who had some contributions reported. Sharps unreported operators, so employees that were paid by Sharps, operator employees paid by Sharps that had no reported contributions. I guess what I'm looking at, what's the shortfall in terms of what Sharps was obligated to pay and what they actually paid and what your contention is they were obligated to have paid if these other affiliated entities were liable for payments? The alleged damages for Sharps-only operators is approximately $4 million. Of that, about $2 million is due and owing specifically to the Health and Welfare Fund for which Mr. Sharpentier has been found personally liable for those contributions, both in the prior 2016 order by Judge Kyle, which is on page 57 of the addendum, and is sort of confirmed or reiterated by Magistrate Judge Brisbois in the report and recommendation on addendums pages 51 and 52. The Sharps liability was also litigated both before the District Court in the prior summary judgment motions, but as well as before the District Court in this case. As I stated on pages 22 of our summary judgment motion, we set forth the detailed audit alleging the three categories of damages that I just discussed, and in fact, the defendants also actively litigated it before the District Court. On page 29 of their summary judgment brief had a category entitled, Plaintiff's Claims Against Sharps Fail Because They Fail to Identify Competent Evidence that Establishes that Sharps Underreported Hours to the Funds. As evidenced by the Plaintiff's Audit... What's the best source in the record for us to look at to see what the underreported... I apologize, Your Honor. The Supplemental Appendix, which is pages 1 through I believe 546 of the Supplemental Appendix, is the broken down by individual audit invoice. There's also in the appendix, it was before the District Court as Exhibit 2, is the brief, more condensed summary that simply lays out what is due from sharps reported, sharps underreported, and then the non-sharps damages. But if you look at the Supplemental Appendix, that very detailed audit is all of the sharps... Page numbers again were... Pages 1 through I believe 546 of the Supplemental Appendix. Narrow it down any more than that. I'm sorry, Your Honor. It's all 500 pages? Correct. Because just so the Court's aware, it's an Excel spreadsheet that was printed, and it's done by month, and it lays out what was paid, what was reported, or in some cases not reported, and therefore what was due and owing on behalf of each individual. Do I recall correctly that the District Court refused to accept a broad site like that for... And that's why it rejected this claim, right? The District Court didn't reject the breach of contract claim. It simply said it wasn't... It was not pled, or it wasn't... That our only theories of relief were for essentially vicarious liability claims. But I don't think you can point to 500 pages and expect the District Court to figure that out. The audit is voluminous simply because there were so many operators. And it expands those pages because we have a six-year audit period, Your Honor, that covers... And because reporting is done by month, you have a column for each month of the six years as well as each of the operator employees that weren't reported or that had underreporting. And so the records are only voluminous simply because there's so much underreporting or alleged underreporting in this case. But the Exhibit 5 and Exhibit 2 to the Summary Judgment, and I can find those appendix pages for you shortly, those are a more condensed version that simply don't provide the detail as the supplemental appendix does. What the supplemental appendix was put in the record after defendants made the contention on appeal that we hadn't identified a single individual for which there was underreporting. And so we felt it necessary to then address each individual that we allege underreporting as opposed to the summary that says our alleged damages for sharps are X, for non-sharps operators would be the other category. Let me ask you this to be sure I'm following you. I have page 7 of the District Court's order, the August order, I think it's the last one. And the centerpiece of that page is the collective bargaining agreement. It's quoted right there. And I thought what the District Court was saying is that you need alter ego, joint venture, joint enterprise, or some vicarious in order to invoke this language. So the District Court did consider the CBA and the District Court did rule on the contract claim. There's two separate claims, Your Honor. The first being sharps as a signatory is required to report on the sharps operators. And that claim wasn't addressed by the District Court as he indicated that our only theories of recovery were for vicarious liability. That language refers to a pipeline and distribution CBA which has that specific contract language which, and I can, and I'm assuming you're reading that if and when employers shall perform work covered by this agreement under its own name, under the name of another, that language, correct? Correct. We had a separate cause of action stating that defendants, the non-signatory defendants, CNG and Alpha, performed work covered by the agreement because they worked in any combination with signatory sharps. And therefore, there was a separate contract claim for damages because of this specific contract language. So they're separate in the sense of the sharps claim for damages is based on the contract which requires them to self-report. And the contract language that the District Court considered on page 7 is with respect to our claim that the contract language given that language broadly also includes CNG and Alpha. And with respect to that contract language, we believe that the District Court erred by concluding that that language required a finding of joint venture, joint enterprise, or alter ego. The plain language of that contract language states that work covered by the agreement under the name of another as a corporation, company, partnership, enterprise, or any combination, including a joint venture. By reading into that a finding that it had to have been joint venture, joint enterprise, or alter ego, the District Court rendered nugatory the language of any combination. And it would be unnecessary for that contract provision to exist at all if it simply meant joint venture, joint enterprise, or alter ego. Are you familiar with the local union 59 case of the Fifth Circuit in 84? Does that one ring a bell with you? It's an electrical workers case versus a green corporation? Because they say that that kind of language requires an alter ego relationship in order to enforce. If you're surprised by the case, you can submit a 28-J letter replying to it. Okay, Your Honor, thank you. I think the plain language of that statute or that contract provision necessarily is more broad than an alter ego finding. And if you read that provision to require the alter ego, you're opening the contract enforcement to be enforced differently depending on the jurisdiction in which you're in. Because the alter ego test in each jurisdiction differs. And in this case, it's a national agreement with a company that's working nationwide. And so how a contract would be enforced would depend on, at that point, it would be a question of whether it's being enforced in the jurisdiction in which it was brought or in the jurisdiction in which it was working. And in this case... What about the Crest Tankers case? And that is cited in the briefs here. The Crest Tankers case of our court, which is in 1986, that's a maritime union case. Do you know about that one? Because it also, at least it's quoted to me, as saying that other affiliates can't be liable under CBA unless their parties are an alter ego. Are you familiar with the Crest Tankers case? I'm familiar with that case. I don't believe that the Crest Tankers case had this specific contract language. And in this case, the parties contracted to include language that would necessarily be more broad than the causes of action that exist at common law. And in this case, you have a situation in which the companies worked in combination throughout the audit period. If you look at the district court's findings with respect to joint venture, for example, the district court concluded there was at least a question of fact based on their financial combination and their employment combination, as well as their operational combination, as to whether or not they formed, that that was sufficient to establish the contribution element for joint venture. It certainly is inconsistent to argue that there's a question of fact as to whether they operated in combination for joint contribution and not find the same with respect to whether they operated in any combination. And in this case, you have additional facts that not outside of the financial employment and operational combination, you have a ownership and management combination. For example, as cited in our brief, from pages 224 to 286, 290 to 293 in the appendix, all wage changes were approved or set by Mr. Charpentier. And Mr. Charpentier testified himself that, I apologize, Mr. Todovich, the alleged president of Sharps, testified that all wage changes he thought had to be approved by Mr. Charpentier, and that's at page 104 of our appendix. You also have, for example, page 563 of our appendix states that all New York hires must go through Kent. He's clearly both exercising hiring, firing wage decisions in this case. We have more than 40 documents in the appendix showing that Mr. Charpentier has consulted on approving day-to-day operations. For example, on page 306 of our appendix, it talks about discussing a meeting, discussing changes Mr. Charpentier requested take place. In 754, Mr. Charpentier wanting an employee incentive package to be instituted. Moreover, there's not a single contract in the record signed by Sharps that was signed by anyone other than Mr. Charpentier or Mr. Munter, neither of which are the alleged president of the companies. There's no single contract, bid, or work order signed by the alleged president of C&G. And the only document in the record signed as the president of Alpha is Mr. Charpentier, no one else. Moreover, you do have evidence in the record of employees from other companies binding Sharps. For example, pages 1160 to 63, Mr. Thompson, an employee paid by C&G, was executing a collective bargaining agreement for Sharps. Ms. Lowery, you're in your rebuttal time. You can continue if you like. I just want to make one brief argument with respect to the trustee's claims with respect to Sutterfuge. I think the district court concluded that without any arms-length agreements, the companies shared employees and shared jobs. By doing so, the companies necessarily misreported those employees. That evidence hasn't been disputed by the defendants. In fact, they admit that they submitted reports on behalf of Sharps' paid employees that were working for C&G and Alpha. And contrary-wise, the district court has found that there were employees for C&G and Alpha that were working on Sharps' projects. The evidence in the record is undisputed that those employees were never reported despite the fact that they were performing work covered by the agreement. I am going to save the remaining four minutes for rebuttal. Thank you. Thank you, Ms. Lowery. Mr. Koppelman. May it please the court, counsel. What I don't want to get lost in all the voluminous appendix and all of the little details that were provided is the reason this case fails throughout is there's no premise that makes sense. The reason that they have to have so many different records and so many pieces is there's no theory that makes sense. And what do I mean by that? I mean, what do you see in the typical case of this nature? You see a union company that is withering on the vine and a non-union company that's taking all of that work. Right? That's the typical case like this. This is absolutely the opposite. When Mr. Sharpentier starts Sharps in 2000, it's in his garage, he's just got a couple of employees. It's struggling along, it's got a few employees. Then at this point, Greensteiner, his partner that he has, not involved in Sharps, but involved in a company called C&G, Greensteiner's the G in C&G. He goes out and they start a company in North Dakota, started C&G. So it's not just the Sharps ownership, it's different ownership. That company starts out in North Dakota. That's a non-union company. Later on, Mr. Greensteiner leaves the business, that wasn't working out. Later on, a different non-union company, Alpha, and this ownership is with Ed Sharpentier. So that's not Ken Sharpentier, the owner of Sharp, it's his brother Ed Sharpentier and Chris Munter. The plan is that they're going to start this non-union company working in the oil fields themselves out in Oklahoma. It's only after the existence of these non-union companies that Sharps really takes off. The union side takes off, and what we see here is over the period of the audit, there are over 2.59 million hours, 2.59 million hours reported to the various Friends Funds. What they have tried to do here is now say, well, yeah, but it was all a subterfuge, a fraud, and it was really for the benefit of these non-union companies. It doesn't add up. And Judge Magnuson really got to the heart of it when he looked at these issues. Let's take the theory of breach of contract, okay? What they do there is they start with that language. The language is broad, don't you? You can see that that language seems to encompass virtually any kind of business operation that could be connected. I would say two things. I would say if you read it broadly, it becomes meaningless because it's every sort of any affiliation, any contract, any connection between the companies. So I think when you look at it. How about you not read it broadly? I think the way I read it is I think the way the district court, when we look at it, if you say the employer shall perform the work. So if we focus on that subsection of the perga, if and when the employer shall perform the work covered by this agreement under its own name, the name of another, or as a corporation, company, partnership, enterprise, or any combination, including a joint venture, this agreement shall be applicable to all work. But again, it has to be that entity performing the work. It has to be sharps performing the work. That's why I don't think it's as broad as maybe a first read would imply because it has to be the employer performing the work. If they wanted to write language that simply says, look, you can't be affiliated with a non-union company. You can't have it. There can be no connection. They could have written that. That's not what we see here. What we see here is the language that says shall perform the work covered. Importantly, if we were to take their misreading, this very broad that it has to cover any sort of business relationship between a union and a non-union entity, then you're running it cross-current with the cases we cite in our brief that says, well, you can't do that under the relevant law. You can't say, well, if you're signatory to a union agreement, you can't have any business relations with a non-union company. And again, why is that? Because what's only permissible under the law is to carve out and protect work that is the work of the bargaining unit. You're trying to maintain that work. And what this would do, if you read it the way they propose, is extend it all over the work. That was never union work. That was never, it's not protecting any work. It's trying to expand the scope. So what they're trying to do is take language that was meant to apply simply to the project itself, to that employer itself, and extend it cross-country to areas and types of projects never intended. Again, this has been found impermissible because the only thing that the law allows is for the protection of that work. Now, if we go to the other issue with respect to the breach of contract, I think what's interesting about the language, as you point out, is it could be read to be broad, is if we go back to the original complaint that started this all, you would think if the trustees believed that that language was that broad, instead of a complaint that really hits hard on alter ego and the alter ego factors, what you would see is this language in the complaint, the specific reference to it, that says, here you go, this is the provision. You don't see that. You don't see that in the complaint. Instead, it's a complaint that although it has breach of contract allegations, it's clear those allegations are relating to this alter ego theory, because again, that's the reading that more narrowly is the proper reading. So, if we switch over. If I understand Ms. Lowry's argument in part, it is that there's also a breach of contract claim that Sharpe's itself failed to report certain hours, that it wasn't dealt with by the district court. What's your response to that? My response is it was dealt with by the district court, and what happened is they just don't have any evidence of it. Okay, where in the district court's order is it? I have the August 20 order. Where is it? What it says is, it says that they are addressing, it addresses, as you mentioned in Ms. Lowry's argument, that they're talking about the breach of contract. It cites that language. Now, does the judge specifically say, and with respect to Sharpe's, individually they haven't provided the evidence to substantiate a claim of under-reporting? It doesn't specifically say those words, but what it does do. What it does do is you have presented to the court, here is a claim that they have not paid the appropriate amount under the funds. And it alleges various theories, the alter ego, etc., and the theory that's in the multiple pages they cite, oh look, they didn't pay even amongst their own employees, they didn't pay appropriately. Now, what you look at there is, what on earth is the evidence? The reason that the district court, I believe, doesn't address that more specifically in detail is not because somehow it was overlooked. It's because the evidence is so weak, it's, and even you heard it today, here after all these years, and here we are at the 8th Circuit of Appeals, well it's in the 500 and some pages, is the essence of what they're saying. And the court is supposed to somehow tease out how amongst the 2.59 million hours reported to various funds over years, these 536 pages somehow substantiate a claim that Sharps has not paid the appropriate amount. No. What should have happened, if they wanted to properly defend against our summary judgment claim, is to present evidence to the court and say, no court, here is the specific evidence that substantiated, and I make clear to you why these amounts are due. You don't see that. Instead, what you see is a hodgepodge of spreadsheets, unsubstantiated, saying, well, here's the amount. Again, none of it is supported by valid evidence. Moving to the issue of alter ego. Two parts to that piece. It has to be sole controlled by another to the extent that it has independent existence in form only. Again, we have lots of evidence of the independent existence of these companies. They're doing lots of business in different parts of the country with different management. I wanted to address specifically the issue raised by the Funds Council with respect to, well, Mr. Todovich, the president of Sharps, testified, well, I thought I had to approve pay raises with Mr. Sharpened here. Why is that consistent with our theory? Think about the nature of the business. It is a unionized workforce at Sharps. They're not adjusting pay. It's not like Steve, the operator, is coming in and saying, well, here's how we do it. No. We're talking about 1,500 to 2,000 employees. It's set by the contracts. What you have there is essentially Mr. Todovich acknowledging, yeah, if I want to raise my own salary or the other folks who work in the office, I'm going to have to go to Ken Sharp. The testimony is further than that. We're related to decision making, pay hiring, and all sorts of decisions. So I don't know that's your strongest point. They shared administrative staff from the beginning. There is shared employees, but they do try to keep them separate. And again, to keep in mind with respect to the informal nature of this, it's easy when you get into these large numbers. Well, it's summary judgment, right? All they've got to raise is a genuine issue of material fact at this point. And boy, you start putting together all this funds going back and forth across the use of workers, the shared corporate headquarters, and I think the first prong, there's a genuine issue of material fact. You think there's not? I think there's not. Okay. Well, what about the second prong? Yeah. The second there is certainly not. Because again, you get back to this issue of subterfuge and perpetuating a fraud. Here's the quote. Use as a subterfuge to defeat public convenience, to justify wrong, or to perpetuate a fraud. It really means anti-union bias. Do you think that's a fair summarization of the cases, or do you think that's unfair? I think to say it's certainly anti-union bias is part of it. You think it's a big part of it? Tell me if I'm wrong. I don't know about labor law. I think certainly anti-union bias is certainly part of what you look at when you're looking at the subterfuge factor. What I don't want to say is the fact that a union company or a non-union company prefers one or the other that somehow now we've shown subterfuge. No, certainly anti-union animus is part of it. The interesting thing is you have the total absence of it here. You have a strong, healthy, growing union entity. You have Mr. Sharpentier who was a union member for years before he got into the business owning side. What you have here is no genuine material fact with respect to that second point. There is swapping of union and non-union employees on some job sites. What do you say on that? That's the real way for it to happen. What I say about that is it's interesting because it's the backwards way here. The fact you have here is you've got a few folks who were close to Ken Sharpentier who hadn't yet vested in their union. Mr. Sharpentier says, okay, a few of these folks, we'll let them continue and we'll make contributions into the union. That's what you have. What they do with that is because that happens to a handful of people, what they do with that is they try to then say, oh, there's some contamination here. Then they make the numbers very large and say, well, it's a huge problem. I thought you did some to avoid friction. Tell me what that's talking about. I thought that was in the record. I think what you're referring to there is a project in Michigan, a particular project in Michigan. What that project was is there's an email in the record and deposition testimony from Christopher Munter that talks about there and the interesting thing is it moves from non-union over to the union side. Again, the details of that aren't clear from the record. What is clear is that it's moving from the non-union side and he's switching it and making over to a union side to avoid any trouble. What they don't want is the trouble. What about the way that you listed some employees by their residence and not really where the job site was and you assigned them to unions that way, hurting one particular union? The interesting thing about that is, one, I think the evidence of that isn't really substantiated in what they cite in the record. Two, the interesting thing is that works across purposes. What they're doing, what you'll see there in the examples they cite, is that would mean more contributions to the actual plaintiffs here, the local fund here. To this very union? I thought it hurt this very union. No. It helped another union. No. What it does is, he's saying in the point they're citing, I believe from your record, I don't have it in front of me. It's 1465 and 1475 according to their brief. Go ahead. I'll take your word for it. What that does is it says, I believe, is that the Missouri one? I think so. Yes. What they say there is, we're going to report him in Minnesota even though he's down in Missouri. One, the evidence of how that should be was certainly never presented to the court in any cogent or fashion that would beat summary judgment. Two, this local union would get the benefit. Local 49 Health and Welfare Fund would get the benefit. It's a very odd example. I think it highlights actually the weakness of their case. When the example they point out is one that would most likely result in payments being transferred from the local 49 Health and Welfare Trust Fund to some other fund. It's a very unusual example that they chose to pick. I think it's unusual because there's just nothing to substantiate this idea that Sharps is under-reporting. Again, if we go back to the history, what you have is another operation, Wilson McShane, did audits. They do the standard audits. Those audits came back clean or relatively clean and there's back and forth about a small change here or there. What does the materiality level of those audits show anywhere in this record? Do you know what I mean by materiality? Auditors say that they're not concerned with a 1% impact or a 5% impact. I don't think that it addresses that particularly. It doesn't address that issue. We're going to leave it to that. What it does do is it shows when you come in and do an audit and you're actually looking at the figures and trying to do it, they come out fine. What we have here is the type of workforce where you have pre-job meetings with the union. These aren't projects hidden away. These are big projects on the union side. They have pre-job meetings with the union folks where they try to establish the right way to pay these contributions. They're submitting the monthly reports. They're getting feedback on the monthly reports. What they point to in that long stack they had, the 536 pages that folds out, is a bunch of spreadsheets that say, well, theoretically we think that these guys should have been categorized differently without any substantiation in the record. Again, that's why on that part of their claim where they're saying Sharpe's failed to make the proper contributions, it's just totally lacking in evidence. It's so lacking in evidence that Magnuson doesn't address it in detail in the order. He just moves on to, look, there's none of this. Why? Because they don't make their case. They don't make their case and they don't provide the necessary evidence. Switching to the joint venture and joint enterprise theories briefly. Again, as the district court pointed out in its order, joint enterprise is generally held for the non-business context. It doesn't really apply well to this sort of situation. Even if you do look at the case they rely on, Minnesota School of Business, it's totally distinguishable. First of all, Minnesota School of Business, if you look at that case, it's a bit of an odd duck. It's an odd duck because joint enterprise and joint venture weren't even pled. They weren't even part of the case. They come up later and the court says, yeah, we're going to find that there's joint enterprise here. But there they were indistinguishable. The two business schools were one and the same in all ways. That comes clear through that opinion. Here it's very different. Then if we move to the joint venture, just briefly as my time is winding down, the court was correct. You don't have a joint venture here. One, what's the venture they're talking about? Are they talking the entire business operations? What is the venture? There's no mutual understanding of a common purpose. These are different businesses trying to make money in different areas. There's joint proprietorship and control in part, but again, even that isn't clean because you've got this history of Ed Sharpentier and Chris Munter and the ownership of the non-union entities that's historically important. You don't have sharing of profits. It's just not there on the record. And you don't have any contract to form a joint venture. There's no overt sharing of profits, but they did combine funds in order to get credit. That's right. There was some joint use of funds. There's certainly some joint use of funds. And I'm glad you point out the credit thing because I'd like to point out when we're talking about real ownership here of some people beyond Ken Sharpentier, Chris Munter, when he became owner of Alpha, he mortgaged his house. You don't do that just because you're not taking real ownership. Again, the ownership is distinct at different times here. And certainly, there was no contract at all, and certainly no contract to enter into a joint venture. Thank you all for your time. Thank you, Mr. Capelman. Ms. Lowry, your rebuttal. Your Honors, I want to first go to the alleged claim that the defendants make that the district court did address damages with respect to Sharpe's. As the court knows, we did request reconsideration from the court with respect to that claim. On page 68 of the addendum, the district court again states, plaintiff's only theory of recovery was that defendants owed delinquent contributions arising from their alleged joint enterprise or joint venture are based on their alter ego status. It's the second to last sentence on page 68. The issue of Sharpe's only damages was litigated by the parties in this case. It was pled, and it wasn't decided by the district court. Now, we talked about page 7 a lot. What about on page 6, where it says, plaintiff's broadly referenced 11 exhibits, each containing documents to support their intentions that defendants intentionally misreported work performed by their, T-H-E-I-R, employees. And he puts that in the general, we're not getting enough good citations. Is that a sufficient reference to payments to their own employees? I don't believe so. What the district court appeared to be referencing in that point was the issue of Sutterfuge, which was discussed at length here. And I think, first of all, it's important to note that the exhibits before the district court were sufficient with respect to the misreporting. For example, the district court states, with respect to exhibit 183, which was the misreporting from 2008 to 2011, the district court just incorrectly states that we didn't include the summary sheets for 2008 and 2011. Those documents are, in fact, both before the district court as exhibit 183, and also before the court here. I'll say pages 1548 through 1559 is the 2008 summary sheets, which is by month indicates who the employee was, where they were working, and where they were reported. And from 1584 to 1597, those are the summary sheets that were created for the 2011 year. So it simply was just an error for the district court to say those exhibits weren't before the district court. But the evidence of Sutterfuge in this case goes well beyond those 11 exhibits that were cited. For example, if you look at page 846 of the appendix, it's a summary that the trustees prepared before the district court had the supporting documentation behind it. It just says, July 2011, Gordy Sather was reported under the Minnesota Builders Agreement representing that he was performing work covered by the Builders CBA within Minnesota. His time cards for the month show he was performing pipeline work for CNG in North Dakota. Similar summary sheets for various employees, various months throughout the audit period, are found in pages 847 through 854 of the appendix. And it's important to note that defendants have made this claim before this court, as well as before Judge Magnuson, that the reporting somehow benefited the funds. The contract in this case dictates how hours are to be reported. In this case, the evidence, at minimum, is a question of fact as to whether or not the defendants in this case adequately and appropriately reported hours to the funds. There was a question with respect to the intentionality or the agreements with respect to Sutterfuge. In this case, I think, if, for example, turn to page 1464 of our appendix, it's a list that has employees on it, and it says, these guys have to stay in the state they're listed under when the timesheet shows the opposite. They need to change the union wage code, which will change the scale and change work to the state, leave the job number the same. I see my time's up, unless the court has questions. I see none. Thank you, Ms. Lowry. Thank you. Thank you also, Mr. Koppelman. Court appreciates both counsel's argument to the court this morning, and the briefing which you have submitted will take your case under advisement. May be excused. Madam Clerk, would you call case number two for the morning? Yes, Judge. Second case is 1831-67, Inline Packaging v. Graphic Packaging International.